**Donald DICKSON, Petitioner–Appellant,**

v.

**G.E. SULLIVAN, Superintendent, Oregon State Correctional Institution, Respondent–Appellee.**

**No. 86–3696.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 8, 1987.

Decided June 13, 1988.

Steven T. Wax, Federal Public Defender, Portland, Or., for petitioner-appellant.

David L. Kramer, Asst. Atty. Gen., Salem, Or., for respondent-appellee.

Before WRIGHT, WALLACE and PREGERSON, Circuit Judges.

WALLACE, Circuit Judge:

Dickson, a convicted murderer, appeals the judgment of the district court denying his writ of habeas corpus. Dickson argues (1) that the trial judge's finding that the jury's exposure to extraneous information was limited to a single statement by a deputy sheriff is clearly erroneous, and (2) that the State of Oregon failed to prove that receipt by state jurors of extrinsic evidence was harmless beyond a reasonable doubt. We have jurisdiction pursuant to 28 U.S.C. § 2253. Because our review of the record convinces us that there is a reasonable possibility that the extrajudicial statement influenced the state court verdict, we reverse the judgment. Consequently, it is unnecessary for us to consider whether the trial judge erred in failing to find that other misconduct occurred.

I

On November 7, 1981, Anderson, owner of the Alibi Tavern in Grants Pass, Oregon, was murdered and robbed while working at the saloon. A police examination and autopsy revealed that repeated blows from a pool cue and other objects caused Anderson's death. There were no eyewitnesses to the murder. The state based its case linking Dickson to the murder principally on testimony that Dickson was at the saloon both before and after the murder, on footprints matching Dickson's shoes found in the blood on the saloon floor, and on the testimony of a fellow inmate who stated that Dickson had admitted while in jail that he killed Anderson. The state also introduced evidence that Dickson had in his possession money approximating the amount that was taken from the saloon on the night of the murder and that Dickson's fingerprints were found on various items at the scene.

Dickson responded to this evidence by testifying that he had been in the tavern before the murder and that he returned later in the evening to find Anderson dead. He admitted checking the cash register for money but testified that the cash register was empty. He also admitted that he took the victim's car keys and stole his car. As for the money he possessed, Dickson testified that a woman with whom he spent an evening had given him approximately $100 and that he had stolen an additional $200 from her. Other evidence introduced at trial established that Dickson had previously been convicted for credit card fraud and was on temporary leave from an Oregon state prison.

After one and a half days of deliberations, the jury returned a unanimous verdict of guilty. Two days after the jury verdict, Dickson's lawyer reported to the trial court that one of the jurors had received a newspaper clipping during trial regarding an alleged past conviction of Dickson. The trial court found that an evidentiary hearing was warranted to determine whether any of the jurors had considered extraneous information in reaching the verdict. After questioning several jurors under oath over a period of four days, the trial judge found that the allegation concerning the newspaper clipping was unsubstantiated. However, he found that a deputy sheriff responsible for escorting the jurors to and from the courtroom had made a statement to two jurors to the effect that Dickson had "done something like this before." He further found that the statement was made between two and six days before the jury retired for deliberations and that neither of the jurors had discussed the statement among themselves or with other members of the jury. He also found that the two jurors had followed his jury instructions limiting the use of prior convictions and directing them to make their decision exclusively on the trial evidence. The trial judge concluded that the remark had not influenced the jury's deliberations, and denied Dickson's motion for a new trial.

On appeal, the Oregon Court of Appeals found that the deputy sheriff's comment violated Dickson's sixth amendment right to confrontation, but held that the error did not warrant reversal of Dickson's conviction. *State v. Dickson*, 63 Or.App. 458, 665 P.2d 352, 355–56 (1983). The Oregon Supreme Court denied Dickson's petition for review. *State v. Dickson*, 295 Or. 541, 668 P.2d 384 (1983). Having exhausted his state remedies, Dickson filed a pro se petition for writ of habeas corpus in the district court pursuant to 28 U.S.C. § 2254. The district court, stating that it was required to give the state trial court's conclusion "substantial weight," upheld the trial judge's determination that the extrinsic evidence complained of did not affect the verdict. The court therefore granted the state's motion to dismiss Dickson's petition

and denied the writ. Dickson timely appealed.

## II

We review the district court's denial of Dickson's habeas corpus petition de novo. *Bayramoglu v. Estelle*, 806 F.2d 880, 886–87 (9th Cir.1986) (*Bayramoglu*). The state court's findings of historical facts are entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *Marino v. Vasquez*, 812 F.2d 499, 504 (9th Cir. 1987) (*Marino*). However, its conclusion that the constitutional error was harmless does not constitute a factual finding entitled to a presumption of correctness under section 2254(d). The question whether the deputy's remarks prejudiced Dickson requires the application of a legal standard to historical facts. *Id.* It is thus a mixed question of law and fact reviewable de novo. *Id.*

A defendant is entitled to a new trial when the jury obtains or uses evidence that has not been introduced during trial if there is "a reasonable possibility that the extrinsic material *could* have affected the verdict." *Id.* (emphasis in original), *quoting United States v. Vasquez*, 597 F.2d 192, 193 (9th Cir.1979) (*Vasquez*); *see also Gibson v. Clanen*, 633 F.2d 851, 855 (9th Cir.1980) (*Gibson*), *cert. denied*, 450 U.S. 1035, 101 S.Ct. 1749, 68 L.Ed.2d 231 (1981). This test is applicable to our collateral review of state court judgments, as well as to cases directly appealed to this court. *Marino*, 812 F.2d at 504. The state bears the burden of proving that constitutional errors are harmless beyond a reasonable doubt. *Id.; see United States v. Littlefield*, 752 F.2d 1429, 1432 (9th Cir.1985) (*Littlefield*). Because the trial judge has a unique opportunity to observe the jurors during trial, to hear the defenses asserted, and to hear the evidence, the trial "judge's conclusion about the effect of the alleged ... misconduct deserves substantial weight." *United States v. Bagnariol*, 665 F.2d 877, 885 (9th Cir.1981) (per curiam) (*Bagnariol*), *cert. denied*, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982). Our review, however, is an independent one,

and we must consider the entire record in determining whether the state has met its burden of demonstrating that extrinsic evidence did not contribute to the verdict. *See id.*

■ Dickson claims here, as he did in his state appeal, that a reasonable possibility exists that the deputy sheriff's statement to two of the jurors affected the verdict. When a jury is exposed to facts that have not been introduced into evidence, a defendant has effectively lost the rights of confrontation, cross-examination, and the assistance of counsel with regard to the extraneous information. *Marino,* 812 F.2d at 505; *Gibson,* 633 F.2d at 854. In the present case, both parties agree that the exposure of the two jurors to the deputy sheriff's remarks violated Dickson's constitutional rights. The parties disagree, however, about whether the state met its burden of proving that the constitutional error was harmless beyond a reasonable doubt.

■ The trial court concluded that the jurors followed instructions directing the jury to base its decision solely on evidence admitted at trial. However, the question whether the introduction of the extrinsic evidence in this case was prejudicial is not a question of historical fact entitled to deference on appeal, but a mixed question of law and fact reviewed de novo. *Marino,* 812 F.2d at 504. Our cases have emphasized that the question of prejudice is an objective, rather than a subjective, one. Thus, "[a] trial judge should not investigate the subjective effects of any [extrinsic evidence] upon the jurors." *Vasquez,* 597 F.2d at 194; *Bagnariol,* 665 F.2d at 884–85. Rather, the trial court's factual inquiry is limited to determining the extent, if at all, to which the jurors saw or discussed the extrinsic evidence. *Vasquez,* 579 F.2d at 194. Thus, we give no deference to the trial judge's conclusion that the jurors in this case in fact obeyed the jury instructions, but must inquire anew whether the state satisfied its burden of proving that the exposure to the evidence was harmless beyond a reasonable doubt. *See Marino,* 812 F.2d at 504.

We have previously identified several factors relevant to determining whether the prosecution has successfully rebutted the presumption of prejudice arising from the introduction of extraneous evidence. These are:

(1) whether the material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the juror discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict.

*Marino,* 812 F.2d at 506, *citing Bayramoglu,* 806 F.2d at 887. Because "[t]he ultimate question is 'whether it can be concluded beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict,'" *Bayramoglu,* 806 F.2d at 887 (citations omitted), no one of these factors is dispositive in a given case. For example, we have previously held that a new trial was required where the jury was exposed to extraneous information highly prejudicial to the defendant, even though it was unclear whether the jury actually considered or discussed the information. *Vasquez,* 597 F.2d at 194. In *Vasquez,* a court file containing inadmissible evidence, rejected jury instructions, and other documents had been left inadvertently in the jury room for four hours. A hearing revealed that several jurors had glanced through the file. One juror remembered that it contained a motion to dismiss; another remembered reading proposed jury instructions. Others did not remember what they read but admitted to looking at portions of the file. We held that the *possibility* that at least one juror had been exposed to some of the more prejudicial information in the file, such as evidence that the appellant had been previously prosecuted for a similar offense, was too great for the court to conclude that the verdict had not been affected by the extraneous information. *Id.*

Subsequent cases have similarly stressed the nature of the extraneous information

when determining whether there existed a possibility that the information affected the verdict. *Compare Littlefield*, 752 F.2d at 1432 (new trial required where magazine article describing fraudulent tax scheme as a problem of national concern and deploring light sentences imposed on participants brought into jury room during trial for tax fraud), *and Gibson*, 633 F.2d at 855 (reversal required where jurors obtained evidence regarding the rarity of defendant's blood type from a medical encyclopedia notwithstanding that the trial court previously ruled that such evidence was inadmissible at trial), *with Bagnariol*, 665 F.2d at 888–89 (reversal not required where no rational connection existed between the extrinsic material and a prejudicial jury conclusion). In *Bagnariol*, for example, we found that information gathered by one juror and communicated to other jurors did not affect the defendant's right to a fair trial where the information was not logically connected to material issues in the case. There, a juror went to a public library and looked in several business publications for references to a nonexistent company created by government agents as a front for a Federal Bureau of Investigation operation. The juror found no references to the fictitious company, and shared this information with the other jurors. The existence of the fictitious company was not in dispute in the trial and the absence of its name from business publications was irrelevant to any material issue in the case. Given the immaterial nature of the information, we concluded that to find a material connection between the extraneous information and the jury's verdict "would require an assumption that the jury members reached an irrational conclusion, lacking in common-sense logic." 665 F.2d at 888. Because "[t]he research merely confirmed what any reasonable juror already knew," *id.*, we held that reversal was not required, despite the fact that the record clearly established that the information had been communicated to several jurors.

In the case before us, the trial court found that the jury had not discussed the deputy's statement during their deliberations. However, it is clear that the deputy's comment was both directly related to a material issue in the case and highly inflammatory. There is a direct and rational connection between the statement that Dickson had "done something like this before" and the conclusion that Dickson had done "this" again. *See United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir.1986) (*Lewis*) (observing that it is extremely difficult for jurors to ignore prior convictions when determining guilt), *modified*, 798 F.2d 1250 (9th Cir.1986); *United States v. Bagley*, 772 F.2d 482, 488 (9th Cir.1985) (*Bagley*) (observing "the human tendency to draw a conclusion which is impermissible in law: because he did it before, he must have done it again"), *cert. denied*, 475 U.S. 1023, 106 S.Ct. 1215, 89 L.Ed.2d 326 (1986); *United States v. Field*, 625 F.2d 862, 872 (9th Cir.1980) (*Field*) (admitting evidence of past convictions of similar offenses raises the spectre of "he did it before, he could do it again"). This is not a case in which the extrinsic information was relatively harmless. *Cf. United States v. Steele*, 785 F.2d 743, 744–49 (9th Cir.1986) (dictionary definitions of ordinary terms); *Bagnariol*, 665 F.2d at 888–89 (information that concededly nonexistent corporation was not listed in business publications). Evidence of prior offenses is likely to prejudice a defendant even where the defendant has the opportunity to rebut the evidence and take other ameliorative steps. *See Bagley*, 772 F.2d at 488 (evidence that defendant has committed a similar crime before poses the risk that the jury will overlook all exculpatory evidence and conclude that "because he did it before, he must have done it again"); *Field*, 625 F.2d at 871 ("It is probable that the admission of any prior conviction prejudices a defendant...."). Our cases have recognized that the danger of prejudice to the defendant is exacerbated where the prior offense is similar to the offense being tried. *Bagley*, 772 F.2d at 488; *Field*, 625 F.2d at 872.

The state argues that given other evidence introduced at trial relating to defendant's past, the deputy's statement that Dickson "had done something like this before" is merely cumulative of other infor-

mation properly in evidence, and thus not prejudicial. However, there was no evidence introduced at trial that Dickson had previously engaged in any acts of violence, let alone an act as brutal and serious as the one with which he was charged. The only evidence of Dickson's other "bad acts" on the record were a conviction for credit card fraud, evidence that Dickson had served time in a state prison, and Dickson's admissions that he stole the deceased's car and took money from a woman with whom he had spent an evening. Though these "bad acts" may have indicated to the jury that Dickson had an unsavory character and a propensity to steal, they in no way suggest that Dickson was a brutal and dangerous man. The deputy's comment, in contrast, suggested for the first time that Dickson was not a stranger to violence. Dickson was on trial for bludgeoning a man to death with a pool cue. The deputy's comment that Dickson had done "something like this before" can only be understood as referring to a previous act of brutality or murder.

We cannot, therefore, accept the state's argument that the deputy's comment was merely cumulative of other evidence on the record. To do so would contradict our cases recognizing that evidence of prior criminal acts is highly prejudicial. *See, e.g., Lewis,* 787 F.2d at 1323; *Bagley,* 772 F.2d at 488; *Field,* 625 F.2d at 871–72.

■ Nor can we accept the state's argument that the trial court's instructions to the jury eliminated any remaining doubt that the comment did not influence the two jurors who heard it. Although we ordinarily assume that instructing the jury to disregard extraneous evidence sufficiently ensures that inadmissible evidence will not influence the jury, *see Bagnariol,* 665 F.2d at 889; *United States v. Bagley,* 641 F.2d 1235, 1241 (9th Cir.), *cert. denied,* 454 U.S. 942, 102 S.Ct. 480, 70 L.Ed.2d 251 (1981), where the extrajudicial statement concerns a defendant's prior criminal acts, the efficacy of such instructions is subject to serious doubt. As we stated in *Lewis:*

> To tell a jury to ignore the defendant's prior convictions in determining whether

he or she committed the offense being tried is to ask human beings to act with a measure of dispassion and exactitude well beyond mortal capacities.

*Lewis,* 787 F.2d at 1323, *quoting United States v. Daniels,* 770 F.2d 1111, 1118 (D.C.Cir.1985). This is especially true where, as here, the defendant was deprived of the opportunity to rebut the evidence, to discuss its significance in argument to the jury, or to take other steps to lessen its prejudicial impact. *Marino,* 812 F.2d at 505; *Gibson,* 633 F.2d at 854.

Finally, we cannot accept the state's contention that the fact that the prejudicial information was communicated to only two jurors is relevant to our harmless error analysis in this case. Dickson was entitled to a unanimous verdict. If only one juror was unduly biased or improperly influenced, Dickson was deprived of his sixth amendment right to an impartial panel. *United States v. Hendrix,* 549 F.2d 1225, 1227 (9th Cir.), *cert. denied,* 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977); *see also Parker v. Gladden,* 385 U.S. 363, 366, 87 S.Ct. 468, 471, 17 L.Ed.2d 420 (1966) (A defendant is "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors.").

### III

■ Our analysis of the likelihood of prejudice in this case leads us to conclude that a reasonable possibility exists that the two jurors who were present when the remark was made were influenced in their determination of Dickson's guilt. This conclusion is consistent with, if not compelled by, our holding in *Vasquez,* where we found that the *possibility* that at least one juror had been exposed to extraneous information regarding a defendant's past convictions warranted a new trial. 597 F.2d at 194. In the present case, it is not a mere possibility, but a *certainty* that one or more jurors were exposed to highly prejudicial information concerning Dickson's alleged prior criminal conduct. Here, as in *Vasquez,* we find it impossible to conclude that this information was harmless beyond a reasonable doubt.

We hold, therefore, that Dickson is entitled to a new trial. Since we find that reversal is required on the facts as found by the state trial court, it is unnecessary for us to reach the other error claimed by Dickson.

We reverse and remand to the district court to grant the petitioner's writ of habeas corpus unless the State of Oregon elects to grant a new trial within sixty days.

REVERSED.