**Steven DELGADO, Petitioner,**

v.

**Bert RICE, Warden, Respondent.**

**No. SA CV 96–372 AHS (MAN).**

United States District Court,
C.D. California,
Southern Division.

Sept. 20, 1999.

Frederick L. McBride, Orange, CA, for petitioner.

Keith Motley, Deputy Attorney General, Office of the Attorney General, San Diego, CA, for respondent.

## ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS

STOTLER, District Judge.

### I.

### INTRODUCTION

On April 19, 1996, petitioner Steven Delgado filed a "Petition For Writ Of Habeas Corpus By A Person In State Custody" ("Petition") pursuant to 28 U.S.C. § 2254. Petitioner's remaining claim is that he was denied his Fifth and Sixth Amendment rights when the trial judge conducted an *ex parte* communication with the deliberating jury. After duly considering the record and available law, the Court concludes that petitioner has been denied due process of law and the right to the assistance of counsel. He is entitled to issuance of a conditional writ of habeas corpus which provides for a new trial if the State of California so elects or which grants petitioner his freedom if the State does not initiate proceedings for a new trial within 120 days from the date this Order is filed.

### II.

### PROCEDURAL BACKGROUND OF PETITION

Although only the first claim remains, Petitioner Steven Delgado originally asserted that his state conviction is unconstitutional on numerous grounds, contending that: (1) the trial judge's *ex parte* communication with the deliberating jury violated his Fifth and Sixth Amendment rights; (2) the trial court excluded relevant evidence thereby denying him due process and the right to present a defense; (3) he was denied due process when the state court failed to grant him a new trial after the victim's mother confessed to the crime; and (4) due process requires a reviewing court to "include it's [sic] doubts" regarding the defendant's guilt when weighing prejudice. (Order filed July 29, 1996, citing Petition, 6–7, by Magistrate Judge Edwards).

As noted in Magistrate Judge Nagle's Report and Recommendation filed June 8, 1998 ("Report"), Respondent filed his Answer on May 13, 1996, and a Supplemental Answer on June 11, 1996. Petitioner filed his Traverse to the Answer and Supplemental Answer on July 10, 1996.

While the matter was still pending before Magistrate Judge Edwards, he issued the July 29, 1996 Order finding that the Petition contained two unexhausted claims, claims two and four, as set forth above. On August 29, 1996, petitioner notified the Court that he elected to dismiss his unexhausted claims and proceed with the two exhausted claims. On October 3, 1996, respondents filed their Second Supplemental Answer. Petitioner filed his Traverse to the Second Supplemental Answer on November 12, 1996.

After the matter was reassigned to Magistrate Judge Nagle, a Memorandum and Order was filed on November 7, 1997, which found that petitioner's third claim, as set forth above, was unexhausted. On November 26, 1997, petitioner elected to dismiss only the unexhausted claim. Petitioner therefore proceeds only on his first claim that the trial judge's *ex parte* communication with the deliberating jury violated his Fifth and Sixth Amendment rights. The June 8, 1998 Report recommended that the Petition be denied. On June 29, 1998, petitioner filed Objections to the Report.

The Court heard oral argument on April 16, 1999. On April 26, 1999, petitioner filed a Supplemental Memorandum of Points and Authorities. After consider-

ation of the Report and the parties' submissions, oral argument, and the Court's independent research, this Court adopts most of the findings of the Report, but concludes that, on balance, the Petition for a Writ of Habeas Corpus should be granted.

### III.

### STATE COURT PROCEDURAL HISTORY

Following a jury trial in Orange County Superior Court, Case No. C–76591, petitioner was convicted on June 29, 1990, of the second degree murder of an eleven-month old infant and misdemeanor child abuse. (The trial court treated the misdemeanor child abuse conviction (Cal.Pen. Code § 273, subd. (a)(2)) as a felony per § 273, subd. (a)(1). The appellate court detected the error and determined that "no more than a misdemeanor may result on retrial in view of the verdict" of the jury. *See* Opinion, Court of Appeal of the State of California, Fourth Appellate District, filed April 30, 1992.) Delgado was found not guilty of assault. (Petition at 2; Clerk's Transcript, "CT", at 158–60.) On October 26, 1990, petitioner received a sentence of imprisonment for 15 years to life for the murder charge and a sentence of 4 years imprisonment on the child abuse conviction to run concurrently. (CT at 437, 439, 440).

Petitioner timely appealed his conviction, raising the issues that the trial judge erred in engaging in an *ex parte* communication with the jury during deliberations and erred in denying a defense motion for a new trial based on the post-trial confession of the infant's mother. Petitioner also challenged the sufficiency of the evidence supporting conviction.

In an unpublished opinion filed April 30, 1992, the California Court of Appeal for the Fourth Appellate District reversed on two grounds. The court held that "the judge erred in holding an informal conversation with members of the jury and in denying the defense motion for new trial" relating to the post-verdict confession.

However, the court found that there was sufficient evidence to support the convictions, and thus held that the case could be retried. *See People v. Delgado,* Unpublished Opinion, No. G010336, filed April 30, 1992 (Crosby, Acting P.J., Wallin, J., concurring; Moore, J., dissenting).

The California Supreme Court reversed the Court of Appeal. *People v. Delgado,* 5 Cal.4th 312, 19 Cal.Rptr.2d 529, 851 P.2d 811 (1993) (Arabian, J.). The Supreme Court held that there was no basis for interfering with the trial court's denial of petitioner's motion for new trial based on the post-trial declaration. The Supreme Court noted that the trial court's ruling on a motion for a new trial "will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." *Id.* at 328, 19 Cal.Rptr.2d 529, 851 P.2d 811, citing *People v. Williams,* 45 Cal.3d 1268, 1318, 248 Cal.Rptr. 834, 756 P.2d 221 (1988). The Court concluded that in light of the facts, the trial judge was "well within his discretion in finding the proffered new testimony lacked credibility, and implicitly finding that it would not have changed the result on retrial." *Id.*

Relevant to the Petition, the Supreme Court reversed the Court of Appeal's decision that the *ex parte* communication between the judge and jury was prejudicial error. The Supreme Court held that although the communication was error, it was not prejudicial. First, the Court found that petitioner

> fail[ed] to point to, and we fail to discern, any misstatement of law in the judge's answer. More importantly, [petitioner] did not object at trial to any misstatement or omission in the trial judge's answer, but rather cooperated in drafting a written answer to the subsequent written jury question.

*Id.* at 331. Second, the Court noted that the petitioner was notified promptly of both the *ex parte* communication and the subsequent written jury question. In response, the petitioner agreed with the court's proposed instructions, requested

nothing additional, and then waited until the next day to move for a mistrial. Further, petitioner failed to assert what would have occurred differently had counsel been present during the communication. The Supreme Court concluded that

> any error by the trial judge in engaging in the *ex parte* communication with the jurors was harmless beyond a reasonable doubt in light of the trial court's correct instructions on the matter, its prompt notification of counsel of the conversation, defendant's agreement to the court's response to the written question, and defendant's failure to request further instructions.

*Id.* at 332.

On remand, the Fourth Appellate District considered several evidentiary issues not relevant here and denied relief. (Supplemental Answer, Ex. B, at 66–69). The California Supreme Court denied review. (Supplemental Answer, Ex. C, at 71).

## IV.

### *FACTUAL BACKGROUND*

#### A. The Murder of Amanda Ruiz

The California Court of Appeal and the California Supreme Court summarized the events of September 25 and 26, 1989, from which the following account is drawn, including the state's case against Delgado as to the charge of murder for the death of Amanda Ruiz, the eleven-month old daughter of his girlfriend, Elizabeth Ruiz.

At the time of the murder, Elizabeth Ruiz was separated from her husband, Manuel Ortiz, and was seeing defendant Steven Delgado. (Reporter's Transcript, "RT", 362). She lived in a one-bedroom apartment with her five-year old son Johnnie and eleven-month old daughter Amanda. (RT 361, 511). On September 26, 1989, just before 8:00 a.m., Elizabeth Ruiz contacted "911" to report that she had awakened to find her daughter Amanda dead.

According to the autopsy, Amanda was beaten to death. She had suffered massive abdominal bleeding, with lacerations of her liver and intestinal wall. She had two skull fractures, numerous facial bruises, and her brain was swollen and showed signs of hemorrhage. The abdominal injuries were consistent with blunt force trauma, the fractures with being thrown against a wall. She also suffered multiple external bruises on her forehead, left cheek area, and right ear, and internal bruises in the back of her head, her back, and her abdominal wall. Her death was attributed to both her massive abdominal bleeding and the swelling of her brain. (RT 896–905).

The pathologist who performed the autopsy testified the victim lived for approximately eight hours after the injuries were inflicted, although the time could have been anywhere from six to twenty-four hours. (RT 900–902). Rigor mortis had already set in when her death was discovered. In a child of her age and under these conditions, that reaction would have been apparent within two to four hours of death and complete within eight to twelve hours. (RT 901, 908, 925–28).

Although the cause of death was clear, ascertaining who was responsible for the infant's murder was not. The criminal investigation and trial testimony yielded numerous conflicting stories, including that of the mother, Elizabeth Ruiz.

Ruiz gave conflicting accounts of the events on September 25 and 26, 1989, to the police, in her testimony at the preliminary hearing, in an Evidence Code 402 (preliminary fact determination) hearing in chambers, at trial, and in her declaration submitted at the hearing on the motion for new trial. To further complicate her account, Ruiz stated that the night before she testified at the preliminary hearing, Manuel Ortiz met with her, pointed a gun at her and told her to "tell them Steve did it." (RT 370–375, 470). She indicated that her memory of the time prior to defendant's arrival that evening was hazy, (RT 340, 350, 498), and, within a few weeks of Amanda's death, Ruiz expressed concern to Elizabeth Drysdale, a therapist she

had begun to see as a result of custody proceedings regarding Johnnie, that she could not remember certain things from the night her daughter was killed. (RT 503–505).

At trial, she testified that she had fed the children and put them to bed between 8:00 and 9:00 p.m. on September 25, 1989. (RT 387). She recalled that she had taken two sleeping pills and that while the children were eating, she remembered picking herself up off the living room floor, but did not know how long she had been there, and did not remember lying down. (RT 343, 391, 488–489).

Ruiz testified that after the children were asleep, her estranged husband, Ortiz, had forced his way into the apartment, entered the bedroom, looked at the children, and then had begun to argue with her. Ruiz testified that she fled in fear that Ortiz was going to beat her as he had done previously, leaving the children asleep in the bedroom. (RT 339, 350–52, 393, 395–400, 507–513). This information was not provided previously to the police, and Ruiz had testified at the Preliminary Hearing that she and appellant were the only adults present at that time. (RT 377–78, 465, 963). Manuel Ortiz testified he did not visit Ruiz that evening. (RT 804–805).

According to Ruiz's trial testimony, when she returned to her apartment, Ortiz was gone, but she noticed that certain photographs of her and defendant, and of her and her children, had been broken and strewn about. (RT 352, 405–406). Ruiz testified that she did not go into the bedroom to check on her children before defendant Delgado arrived, (CT 393–404) but was impeached by a statement she gave officers at the time the incident was investigated. (RT 410, 986). Ruiz later revealed that she remembered "jumping" into the bed in which Amanda was sleeping sometime prior to defendant's arrival and could not remember if she hit Amanda when she jumped into the bed. She further noted that she thought Amanda had

been hurt before defendant arrived. (RT 332–335, 344).

On September 25, 1989, defendant played softball and drank beer with his teammates. (RT 1133–1137). Soon after eleven in the evening, Delgado arrived at Ruiz's apartment. After he arrived with a pizza, Ruiz went to the store, leaving defendant alone with the children. (RT 415–420). Upon her return, she noticed blood on his baseball shirt, which he claimed resulted from being hit in the nose by a ball. (RT 426–427). Defendant told Ruiz that he had heard Amanda crying but had sung her back to sleep. (RT 420). Ruiz and defendant ate, had sexual relations, and spent the night in the living room, during which time Ruiz testified she did not hear either child cry. (RT 420–424).

The next morning, Ruiz went into the bedroom where her children were and fell back asleep with them, noticing no injuries to either child. (RT 425). Around 6:40 a.m., defendant entered the doorway to tell Ruiz he was leaving, and she accompanied him to the living room. (RT 429–430). Defendant testified that when he looked in the bedroom on that morning, Ruiz said "Shhh, you'll wake the kids." (RT 1170).

Ruiz testified that after defendant left, she returned to the bedroom, went back to sleep, was awakened once by a telephone call from Delgado's mother, then again returned to sleep until she arose for the day at approximately 7:30 a.m. (RT 383, 421–33). She then woke Johnnie. Shortly thereafter Ruiz noticed that her son had a bloody mouth, and she was unable to awaken Amanda, even after shaking her. (RT 558–560). Ruiz then realized her daughter was dead. She called Delgado who instructed her to call "911." (RT 385, 438–454).

A nine-year-old boy who lived next door recalled a baby crying at about midnight, heard a woman yell, "Help, help, let me alone. I don't want any problems," then heard pounding on the wall and a man's voice saying, "shh." (RT 765–783, 978).

The victim's brother, Johnnie, initially told the police that "two bad men" entered the bedroom through the window and hurt them, but there were no signs of forced entry and the window was locked. Johnnie specifically denied that it was defendant who beat them, and then added that his mother told him to say the two bad men did it. It was not until later that Johnnie blamed Delgado and reenacted the incident on video tape for the police, which was introduced into evidence by stipulation. (RT 706–753, 1312–1314). A child psychiatrist testified the method of interviewing Johnnie was overly suggestive and there was a grave danger that his memory of the events was inaccurate.

In addition, Delgado's estranged wife received a call from him the night of September 25 and refused his request to visit. After the baby's death, he told her, "See ... if you would have let me come over, all this wouldn't have happened." (RT 879). However, Delgado denied guilt at trial and testified that he never harmed Amanda or noticed she was injured that evening.

## B. *Ex Parte* Communication

On June 27, 1990, before the commencement of the second day of deliberations, the judge engaged in an *ex parte* conversation with the jurors. It was immediately summarized for counsel and made part of the record. According to the judge, the following occurred:

> As the jurors were arriving, I told them not to worry if the fire alarm went off as they were working on the alarm system and would be testing it. The bailiff had missed the briefing and was unaware of the testing. One of the jurors asked if she could raise a general question not pertaining to the case. I told them I could not answer any question which might relate to the case without talking to the attorneys. **She then asked the question of a person charged with rape who had previously been convicted of rape. I told her, and the others present, that the law basically said that was inadmissible as it would cause a jury to conclude a defendant who had done it before had done it again. This could result in a finding of guilt, just because of that and opined that would not be fair.** Several jurors volunteered they agreed with this position. One of them asked if ... previous conduct (I assumed he meant general deportment) was relevant. I answered that except in specific instances it was not relevant nor admissible.

(CT 144–145).

After the *ex parte* communication, during the afternoon of the same day, the jury sent several questions to the court. *Delgado*, 5 Cal.4th at 331, 19 Cal.Rptr.2d 529, 851 P.2d 811. (CT 145–149, 154–157). The third such question was a written request to the trial court which read as follows:

> If available, would the prosecution have been allowed to present evidence and/or testimony indicating that [defendant] had a tendency toward violence. (For example, similar to that presented concerning Manual [sic] Ortiz).

(CT 156).

After conferring telephonically with counsel, this response was submitted to the jury:

> You must decide all questions of fact in this case from the evidence received in this trial and not from any other source. You are not to speculate as to the existence or nonexistence of any fact not suggested by the evidence.

(CT 145, 156).

During the afternoon of the next day, June 28, 1990, defendant moved for a mistrial based on the *ex parte* communication, on the ground that

> the information that I believe would have been taken or given to the jurors may well have indicated to them that there could have been evidence damaging to the defendant outside of the evidence, which was, for one reason or another, not admissible or relevant under the law. I think that, then, allows the jury to speculate that there may well be some fact out there that they were

interested in that was not allowed to come into evidence because of some ruling by the court or principle of law. And I think that the danger is great that such an assumption on their part would have a negative influence on Mr. Delgado's ability to have a fair trial. They were obviously interested in that issue, in that they have sent a letter later in the afternoon asking almost an identical question that was asked earlier to the court.

(RT 1670–71).

The motion was denied. The court found that "[t]he answer given in response to the written question was substantially the same as the answer that they secured out of me as they came in that morning. Obviously, it was something that they had been worrying about, kicking around back there." (RT 1670–73).

The jury returned a verdict of guilty on June 29, 1990. (CT 158–160).

### C. Defendant's Motion for a New Trial

Delgado's counsel filed a motion for new trial based on the discovery of new evidence, and other contentions, including that there was insufficient evidence for conviction, that the trial court should grant his motion for a new trial based on Ruiz' confession, and that there had been judicial misconduct due to an *ex parte* communication with the deliberating jury. This motion was accompanied by a declaration from Ruiz, signed September 27, 1990, claiming that she killed Amanda. In response to defense counsel's argument about the *ex parte* communication issue in the motion for a new trial (RT at 1731–41), the trial court ruled that the error caused by the conversation with the jury was harmless beyond a reasonable doubt and denied the motion. (RT 1742–43, 1750–52).

### V.

### PARTIES' CONTENTIONS ON HABEAS CORPUS

Petitioner seeks relief on the remaining first claim of his Petition: "The Petition-er's rights under the 5th and 6th Amendment[s] were violated by the trial judge's ex-parte communication with the deliberating jury." (Petition at 6; *see also*, Traverse to Second Supplemental Answer at 28–29).

Respondent's position is set forth in the Second Supplemental Answer to Petition, filed October 6, 1996. Via lengthy excerpts from *Rushen v. Spain*, 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983), and the California Supreme Court's opinion in this case, respondent set forth its position that "[t]he determination by the California Supreme Court that the *ex parte* communication by the trial judge was harmless was a reasonable application of the law and should be respected." (*Id.* at 24).

In his Objections to the Report of the Magistrate Judge, petitioner argues that "it is the *nature of the communication* and the time during the trial that the error occurs that determines whether a given constitutional error is 'structural' or a 'trial error,'" rather than the mere labeling of the error as an *ex parte* communication. (Objections to Report and Recommendation at 2). Petitioner illustrates his point with a number of examples of situations where an *ex parte* communication could not possibly be trial error, such as if a judge told a jury that a defendant's involuntary confession was not admitted or that illegally obtained evidence had been kept from them. (*Id.*)

Petitioner contends that a reading of *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), and the cases below, clearly points to the conclusion that the error in this case was structural, mandating that the petition be granted. Petitioner distinguishes the cases of *Rushen*, and *United States v. Gagnon*, 470 U.S. 522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985), as factually dissimilar. In *Gagnon*, the defendant's attorney was present during an *ex parte* communication between the judge and a juror, and the conversation related to the juror's concern

that the defendant was sketching pictures of the jurors. In *Rushen*, the judge and juror did not discuss any fact in controversy or any law applicable to the case. Here, petitioner argues, the conversation between the judge and jury

> was specifically and unequivocally about the law which the jurors obviously found 'applicable to the case.' They wanted to know (and asked twice several hours apart) whether they could assume the absence of evidence regarding past misconduct meant that the defendant hadn't been in trouble before or whether the law precluded the prosecution from introducing such evidence. This conversation was about the law and it pertained to this case.

(Objections at 3). In this Circuit, petitioner contends, it is the nature, and not the label, of the error that determines outcome. Petitioner cites to a number of cases in which structural error was found.

Petitioner also argues that even if the Court determined the judge's error to be trial error, reversal is still required. (Objections at 5). Petitioner adds that the judge's statement to the deliberating jury was not a correct statement of California law, even though "the accuracy or inaccuracy of the statement of law is entirely irrelevant to this case" because "[t]he point is that the jury was told that, very possibly, they were not given what they felt to be relevant information regarding the defendant because of some rule of law." (Objections at 7).

At the hearing before this Court, counsel for petitioner loosely defined structural error as a defect in "the way we do things." As applied to this case, counsel argued that "the way we do things" is that the jury is not instructed *ex parte* on substantive law. Had the judge told the jury "sometimes we can't tell you bad things" the error would be unmistakable. Petitioner's counsel clarified that he does not contend that all judge-jury *ex parte* communications constitute structural error, but that *ex parte* communications occurring during deliberations should be so

considered. To the charge that it is petitioner's duty to show that actual prejudice resulted, counsel responded that common sense tells us that the judge's response affected the jury. Counsel noted that the inner workings of the jurors' collective mind is not subject to scrutiny, and so one can only speculate as to what common sense dictates. One can surmise that had the judge refused to answer and convened the parties, the petitioner would have requested that the judge take no action at all, or that the judge provide a copy of the pertinent jury instructions. Here, instead, the jury asked the judge a question about the law, they listened, and they potentially accorded it—the fact that evidence of prior violence or misconduct may have been kept from them because of the strictures of the law—more weight than anything presented by the attorneys. Thus, the *ex parte* communication functioned as an instruction. Nothing could be more structural and inconsistent with "the way we do things" than instructing the jury outside the presence of counsel and the defendant.

Respondent's counsel argued that under *Rushen*, an *ex parte* communication is a trial error and that no case holds that such an error is structural. Respondent also argued that the California Supreme Court is entitled to deference, and, that unless the Court determines that the Supreme Court was clearly wrong, its decision should stand. Respondent conceded that the judge committed error by instructing the jury *ex parte*, but that the Court must consider the totality of the circumstances. Respondent added that the *ex parte* communication was more akin to an informal comment than an instruction, and counsel noted the presumption that the jury followed the court's official instructions as given. In response to the Court's question as to how respondent could be sure that the jury did not treat the *ex parte* communication as an instruction, respondent noted that the jury asked substantively the same question hours later.

Petitioner filed Supplemental Points and Authorities after the hearing. Buoyed by an analysis of *Dyer v. Calderon,* 122 F.3d 720 (9th Cir.1997), vacated on other grounds, 151 F.3d 970 (9th Cir.1998), *Rice v. Wood,* 77 F.3d 1138 (9th Cir.1996), and *Hegler v. Borg,* 50 F.3d 1472 (9th Cir. 1995), petitioner argued that

> [t]he message to be gained from all three of the cases discussed herein is that where the defendant is excluded from a proceeding during which he would have had a right to attempt to influence the outcome, then the error is to be deemed 'structural' rather than 'trial,' and is not therefore subject to harmless error analysis.

(Supplemental Points and Authorities at 5).

## VI.

### *DISCUSSION*

**A. Application of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, S 205(a)(1)(F), 110 Stat. 1214, 1230, amended at 28 U.S.C. § 2253 ("AEDPA")**

As noted in the Report, the AEDPA does not apply to the Petition. The AEDPA became effective on April 24, 1996. Subsequent to the date on which Respondents filed their Second Supplemental Answer, the United States Supreme Court explicitly held that the AEDPA revisions only apply to habeas petitions filed after its effective date. *See Lindh v. Murphy,* 521 U.S. 320, 326–27, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); after remand, *cert. denied,* 522 U.S. 1069, 118 S.Ct. 739, 139 L.Ed.2d 676 (1998). The "date [of the filing] of [the] Petition for a Writ of Habeas Corpus is the determinative date from which to judge the applicability of the AEDPA." *Fuller v. Roe,* 182 F.3d 699, 1999 WL 462632 (9th Cir.1999). This Petition, filed on April 19, 1996, is, therefore, not subject to the provisions of the AEDPA. *See Jeffries v. Wood,* 114 F.3d 1484, 1494–96 (9th Cir.1997) (en banc), *cert. de-*

*nied,* 522 U.S. 1008, 118 S.Ct. 586, 139 L.Ed.2d 423 (1997).

**B. Evidentiary Hearing**

In this case, no party asserts that an evidentiary hearing is needed. In respondent's Supplemental Answer to the Petition for Writ of Habeas Corpus, filed on June 11, 1996, respondent argued that there was no need for an evidentiary hearing, reasoning that the petition must be dismissed for procedural reasons. In petitioner's Traverse to Answer and Supplemental Answer, filed on July 10, 1996, petitioner admitted that there was no need for an evidentiary hearing. Again, in respondent's Second Supplemental Answer to Petition for Writ of Habeas Corpus, filed on October 3, 1996, respondent confirmed that the factual basis for petitioner's claim was developed in the state court proceedings, and therefore, there was no need for an evidentiary hearing.

■ Petitioner is entitled to an evidentiary hearing if (1) he has alleged facts which, if proved, would entitle him to relief; and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts. *See Turner v. Marshall,* 63 F.3d 807, 815 (9th Cir. 1995) (quoting *Tinsley v. Borg,* 895 F.2d 520, 530 (9th Cir.1990)); *Seidel v. Merkle,* 146 F.3d 750, 753–54 (9th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 850, 142 L.Ed.2d 704 (1999). "The corollary to this is that no hearing is required if either the state court has reliably found the relevant facts, or there are no disputed facts and the claim presents purely a legal question." *Hendricks v. Vasquez,* 974 F.2d 1099, 1103 (9th Cir.1992), *cert. denied,* 517 U.S. 1111, 116 S.Ct. 1335, 134 L.Ed.2d 485 (1996). The issues in this case are how the constitutional error should be characterized, and whether it requires habeas relief. Additionally, the Court's independent review of the state court record in reaching this conclusion would make review of the Petition without an evidentiary hearing

proper. *See Lincoln v. Sunn,* 807 F.2d 805, 808 (9th Cir.1987).

## C. Judge–Deliberating–Jury *Ex Parte* Contact

The Supreme Court has adjudicated on several occasions the errors committed by trial judges and deliberating jurors when they make contact with each other about the merits of the case on which deliberations are being conducted. In *United States v. United States Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), the Court observed:

> Any ex parte meeting or communication between the judge and the foreman of a deliberating jury is pregnant with possibilities for error. This record amply demonstrates that even an experienced trial judge cannot be certain to avoid all the pitfalls inherent in such an enterprise. First, it is difficult to contain, much less to anticipate, the direction the conversation will take at such a meeting. Unexpected questions or comments can generate unintended and misleading impressions of the judge's subjective personal views which have no place in his instruction to the jury—all the more so when counsel are not present to challenge the statements.

In *Gypsum,* even though the parties had consented to the judge's private meeting with the foreman, the Supreme Court found that the Court of Appeals would have been justified in reversing the convictions solely because of the risk that the foreman believed the court was insisting on a dispositive verdict; "a belief which we must assume was promptly conveyed to the jurors." *Id.* The Court also observed that the absence of counsel from the meeting, along with the unavailability of a transcript or full report of the meeting, aggravated the problems of having one juror serve as a conduit for communicating instructions to the whole panel. More importantly, "[c]ounsel were thus denied any opportunity to clear up the confusion regarding the judge's direction to the foreman, which could readily have been accomplished by requesting that the whole jury

be called into the courtroom for a clarifying instruction. See *Rogers v. United States,* 422 U.S. 35, 38, 95 S.Ct. 2091, 2094, 45 L.Ed.2d 1 (1975); *Fillippon v. Albion Vein Slate Co.,* 250 U.S. 76, 81, 39 S.Ct. 435, 436, 63 L.Ed. 853 (1919)." In fact, the Court explained:

> Thus, it is not simply the action of the judge in having the private meeting with the jury foreman, standing alone—undesirable as that procedure is—which constitutes the error, rather, it is the fact that the ex parte discussion was inadvertently allowed to drift into what amounted to a supplemental instruction to the foreman relating to the jury's obligation to return a verdict, coupled with the fact that counsel were denied any chance to correct whatever mistaken impression the foreman might have taken from this conversation, that we find most troubling.

*Gypsum,* 438 U.S. at 462, 98 S.Ct. 2864.

The *Gypsum* opinion condemned the unintended direction of the colloquy between the judge and the jury foreman, pointing out that the episode "illustrates the hazards of ex parte communications with a deliberating jury or any of its members." *Id.*

In *Rogers v. United States,* 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975), the Court reversed a conviction on the basis of Federal Rule of Criminal Procedure 43 which guarantees to a defendant in a criminal trial the right to be present "at every stage of the trial including the impaneling of the jury and the return of the verdict." Neither defendant nor his counsel was present when the trial judge answered a jury note through the marshal that the judge would accept a verdict of "Guilty as charged with extreme mercy of the Court." The Court noted that although a Rule 43 violation may in some circumstances be harmless error, the nature of the information conveyed to the jury, in addition to the manner in which it was conveyed, did not permit that conclusion in that case.

In both *Rogers,* above, and *Shields v. United States,* 273 U.S. 583, 47 S.Ct. 478, 71 L.Ed. 787 (1927), on which *Rogers* relies, the communication from the jury was said to be "tantamount to a request for further instructions." *Rogers,* 422 U.S. at 39, 95 S.Ct. 2091. Similarly, in *Fillippon,* a civil case, the Court observed that the orderly conduct of a trial by jury, essential to the proper protection of the right to be heard, entitles the parties who attend for the purpose to be present in person or by counsel at all proceedings from the time the jury is impaneled until it is discharged after rendering the verdict. The trial court was found to have erred in giving a supplementary instruction to the jury in the absence of the parties and without affording them an opportunity either to be present or to make timely objection to the instruction. *Rogers,* 422 U.S. at 38, 95 S.Ct. 2091.

In *Rushen,* the Supreme Court wisely observed that " 'it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.' " quoting *Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). However, the facts of *Rushen* pertained to an *ex parte* communication that was "innocuous." *Id.,* 464 U.S. at 121, 104 S.Ct. 453. In fact, the judge and juror "did not discuss any fact in controversy or any law applicable to the case." *Id.* In conclusion, the Court held that "the state courts had convincing evidence that the jury's deliberations, as a whole, were not biased by the undisclosed communication of juror Fagan's recollection." *Id.*

### D. § 2254 Habeas Corpus Relief

Both petitioner and respondent agree that a constitutional error occurred when the trial judge conducted his *ex parte* communication with the deliberating jury in violation of petitioner's Fifth and Sixth Amendment rights. The California Court of Appeal and the California Supreme Court also found constitutional error. Thus, the question presented in this Court is to determine whether the constitutional error was structural or trial error—and thereafter to determine whether the error requires federal habeas relief.

### 1. Constitutional Error

■ Constitutional errors that occur during trial are divided into two categories: structural errors and trial errors. Trial errors are those "which occur[ ] during the presentation of the case to the jury, and which may therefore be quantitatively assessed" in the context of the trial as a whole to determine whether they are harmless. *Arizona v. Fulminante,* 499 U.S. 279, 307–08, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Structural errors, on the other hand, are defects "affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id.* at 310, 111 S.Ct. 1246.

### 2. Standard of Review

Structural errors are "structural defects in the constitution of the trial mechanism," therefore, these errors "defy analysis by 'harmless-error' standards." *California v. Roy,* 519 U.S. 2, 5, 117 S.Ct. 337, 136 L.Ed.2d 266 (1996) (citing *Brecht v. Abrahamson,* 507 U.S. 619, 629, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). If the error is characterized as structural, then defendant's "criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence." *Rose v. Clark,* 478 U.S. 570, 577–78, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986). In that case, "defendant's conviction must be reversed." *Atwood v. Warden,* 1999 WL 390852 *4 (N.D.Cal.1999); *see also Suniga v. Bunnell,* 998 F.2d 664, 667 (9th Cir.1993).

Trial errors are those errors "which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Suniga,* 998 F.2d at 667; *Atwood,* 1999 WL 390852.

When the constitutional error is "trial error," a federal court reviewing a state court determination in a habeas corpus proceeding ordinarily should apply the 'harmless error' standard enunciated in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), asking "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *California v. Roy*, 519 U.S. at 4–5, 117 S.Ct. 337, (citing *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710). This standard has been characterized as reflecting the "presumption of finality and legality" that attaches to a conviction at the conclusion of direct review. *Calderon v. Coleman*, 525 U.S. 141, 119 S.Ct. 500, 503, 142 L.Ed.2d 521, 527 (1998) (citing *Brecht*, 507 U.S. at 633, 113 S.Ct. 1710).

The petitioner must show that he has suffered "actual prejudice" as a result of the *ex parte* communication. *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710. However, the Supreme Court has added in reference to trial errors that "where a judge, in a habeas proceeding, applying this standard of harmless error, 'is in grave doubt as to the harmlessness of an error,' the habeas 'petitioner must win.'" *California v. Roy*, 519 U.S. at 5, 117 S.Ct. 337 (citing *O'Neal v. McAninch*, 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)). Therefore, without shifting the burden of establishing whether the error was prejudicial, the harmlessness standard involved places the risk of doubt on the State. *O'Neal*, 513 U.S. at 439, 115 S.Ct. 992.

### 3. Deference to State Court Findings

When reviewing a state court determination in a habeas corpus proceeding, the federal court must presume that the state court findings of fact are correct. 28 U.S.C. § 2254(e)(1) [28 U.S.C. § 2254(d) when petition was filed]. However, this Court must consider whether the "constitutional error" was structural, and therefore not subject to harmless error review, or whether the error was "trial error," followed by an independent determination whether that error was harmless, "not a factual determination entitled to the statutory presumption of correctness." *Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995); *see also Suniga*, 998 F.2d at 667; *Dickson v. Sullivan*, 849 F.2d 403, 405 (9th Cir.1988); *Hassine v. Zimmerman*, 160 F.3d 941, 947 (3rd Cir.1998); *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999).

### E. The *Ex Parte* Communication as Constitutional Error

The California reviewing courts both agreed with the trial court that constitutional error had occurred, but differed as to the effect of the error. The intermediate court of review, the Court of Appeal, ruled that "[i]t is impossible to say the error was harmless beyond a reasonable doubt." (Unpublished Opinion, No. G010336, at 11). The California Supreme Court held that the *ex parte* communication did constitute federal constitutional error, but that the error was harmless beyond a reasonable doubt. *People v. Delgado*, 5 Cal.4th 312, 330–32, 19 Cal.Rptr.2d 529, 851 P.2d 811 (1993). The Supreme Court based its conclusion on the following: (1) the trial court's correct instructions in response to the subsequent written jury question, (2) its prompt notification to counsel of the conversation, (3) defendant's agreement to the court's response to the written question, and (4) defendant's failure to request further instructions. *Id.* at 331–32, 19 Cal.Rptr.2d 529, 851 P.2d 811. (citing *People v. Jennings*, 53 Cal.3d 334, 384–85, 279 Cal.Rptr. 780, 807 P.2d 1009 (1991)). The Court also noted, in defense of its conclusion that any perceived prejudice was not obvious, that the defendant waited until the afternoon of the next court day to move for a mistrial and that the jury's follow-up written question was the *third* question of the day. *Id.* at 331, 19 Cal.Rptr.2d 529, 851 P.2d 811.

In this Court, Petitioner claims that the California Supreme Court erred in determining that the error was not prejudicial. (Petition at 6). As noted, respondent agrees to the fact of federal constitutional

error arising from the *ex parte* communication. (Second Supplemental Answer at 2, 21).

Both the trial court and the California Supreme Court found that the *ex parte* communication did not prejudicially affect the jury's impartiality. (RT at 1743, 1750–51); *People v. Delgado,* 5 Cal.4th at 331, 19 Cal.Rptr.2d 529, 851 P.2d 811.

The Supreme Court in *Rushen v. Spain,* 464 U.S. at 120, 104 S.Ct. 453, found that the "substance of the *ex parte* communications and their effect on juror impartiality are questions of historical fact entitled to [the] presumption [of correctness]." This finding can be set aside by this Court "only if it lacks even a fair support in the record." *Id.* As earlier noted, in *Rushen,* "both the state's trial and appellate courts concluded that the jury's deliberations, as a whole, were not biased." *Id.* In this case, the California courts made conflicting rulings. Neither the California Supreme Court nor the Court of Appeals analyzed the constitutional error in terms of structural or trial error.

Subsequent development of the constitutional error analysis has led the Court of Appeals for the Ninth Circuit to hold that "[w]hether the constitutional error was harmless is not a factual determination entitled to the statutory presumption of correctness under 28 U.S.C. § 2254(d)." *Lawson,* 60 F.3d at 612 (as amended, 28 U.S.C. § 2254(e)(1)); *see also, Thompson v. Borg,* 74 F.3d 1571, 1573 (9th Cir.1996); *Dickson v. Sullivan,* 849 F.2d 403, 405 (9th Cir.1988).

### F. Structural Error

 Although many constitutional errors have been held amenable to harmless-error analysis, the Supreme Court held in *Arizona v. Fulminante* that defects "affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself," are structural errors, and are not subject to harmless error analysis. *Arizona v. Fulminante,* 499 U.S. 279, 309–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Distinguishing trial error—that which occurs "during the presentation of the case to the jury and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt"—the *Fulminante* Court noted several examples of defects considered to be "structural defects in the constitution of the trial mechanism." *Id.* Structural errors are those that "transcend the criminal process" and include the following: (1) total deprivation of the right to counsel at trial (*Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)); (2) a biased judge (*Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927)); (3) unlawful exclusion of members of the defendant's race from a grand jury (*Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986)); (4) the right to self-representation at trial (*McKaskle v. Wiggins,* 465 U.S. 168, 177–78, n. 8, 104 S.Ct. 944, 950–951, n. 8, 79 L.Ed.2d 122 (1984)); and (5) the right to a public trial (*Waller v. Georgia,* 467 U.S. 39, 49, n. 9, 104 S.Ct. 2210, 2217, n. 9, 81 L.Ed.2d 31 (1984)). *Id.* at 309–11, 111 S.Ct. 1246.

In *Sullivan v. Louisiana,* 508 U.S. 275, 278, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), the Supreme Court further defined the distinction between trial errors subject to harmless-error review and structural errors requiring invalidation of a conviction. In *Sullivan,* the petitioner was charged with and convicted of first-degree murder and sentenced to death. In the jury instructions, the judge gave a definition of "reasonable doubt" that had previously been found unconstitutional. *Id.* at 277, 113 S.Ct. 2078. The state appellate court held that the erroneous instruction was harmless beyond a reasonable doubt. *Id.* The Supreme Court discussed the interrelatedness of the Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment's requirement of a jury verdict. The Supreme Court noted that it

would not satisfy the Sixth Amendment to have a jury determine that the defendant is probably guilty, and then leave it up to the judge to determine ... whether he is guilty beyond a reasonable doubt. In other words, the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt.

*Id.* at 278, 113 S.Ct. 2078. Because the constitutionally defective jury instruction does not produce such a verdict, the petitioner was denied his right to a jury trial. *Id.*

The Court of Appeals for the Ninth Circuit has issued several opinions contributing to this legal landscape by finding structural error in *Harmon v. Marshall,* 57 F.3d 763 (9th Cir. June 9, 1995), *amended* 69 F.3d 963 (9th Cir.1995) (failing to instruct the jury on any element of the counts challenged by defendant undoubtedly affected defendant's constitutional right to a proper jury verdict, requiring reversal); *but see Neder v. United States,* —— U.S. ——, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (giving erroneous jury instruction that omits an element of an offense subject to the harmless-error analysis); *United States v. Noushfar,* 78 F.3d 1442 (9th Cir.1996) (allowing a jury to take audiotapes that had not been played in open court into the jury room, over defendant's strenuous objections, constituted structural error requiring automatic reversal); *Guam v. Marquez,* 963 F.2d 1311, 1315 (9th Cir.1992) (structural error where court gave written jury instructions to the jury in lieu of reading them in open court); and *Riley v. Deeds,* 56 F.3d 1117, 1121 (9th Cir.1995) (structural error when audiotape replayed in court without judge or clerk present); *see also Suniga v. Bunnell,* 998 F.2d 664, 670 (9th Cir.1993) (instructing jury on nonexistent felony-murder charge during assault with deadly weapon so in-

fected entire trial that conviction violated due process, requiring reversal).

Although many courts have grappled with the trial-structural error dichotomy developed in *Fulminante* and refined in *Sullivan,* no court has addressed whether the specific issue presented in this case, namely, *ex parte* communication between a judge and jury during deliberations and relating to substantive law, falls under the category of trial error or structural error.[1]

The *Noushfar* decision presents an apt analogy to this case, supporting the conclusion that the *ex parte* communication constitutes structural error. In *Noushfar,* defendants were indicted for conspiracy to smuggle Iranian—origin rugs into the United States and other charges related to smuggling. *Noushfar,* 78 F.3d at 1444. During the course of the undercover investigation, customs agents recorded many potentially incriminating conversations with the defendants. *Id.* At trial, the district court allowed the jury to take fourteen tapes that had not been played in the courtroom during trial into the jury room during deliberations. *Id.* In addition, they received no jury instructions about the tapes. *Id.* The Court distinguished the case from those involving replaying tapes to a jury and which the Court had previously held to present errors subject to the harmless error analysis. *Id.* at 1445. The Court held that to send unplayed tapes into the jury room violated Rule 43 and possibly the Confrontation Clause, and "the basic framework of the trial system, which requires that evidence be presented and tested in front of the jury, judge, and defendant." *Id.*

In *Noushfar,* the Court cited two Ninth Circuit cases, *Guam v. Marquez,* 963 F.2d 1311, 1315 (9th Cir.1992), and *Riley v. Deeds,* 56 F.3d 1117, 1121 (9th Cir.1995), in

---

1. The Report and Recommendation concludes that *ex parte* communications between the judge and jury are subject to the harmless error analysis, citing *Rushen v. Spain,* 464 U.S. 114, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) and *United States v. Gagnon,* 470 U.S.

522, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985). (Report at 8). The applicability of these cases, decided prior to the creation of the structural—trial error dichotomy in *Fulminante,* is an open question.

which the Court also found structural error. In *Guam,* the Court found structural error where the court gave written instructions to the jury in lieu of reading them in open court. *Guam,* 963 F.2d at 1315. The Court concluded that such an error was structural and similar to that in *Noushfar,* because "the impact of the error on the jury's performance of its duties cannot be reviewed." *Noushfar,* 78 F.3d at 1445. In *Riley,* the Court found structural error when an audiotape was replayed in court without the judge or clerk present. *Riley,* 56 F.3d at 1121. The Court concluded that a structural error analysis was appropriate when there was a "complete abdication of judicial control over the process. In this structural vacuum, a rule requiring the defendant to show prejudice, or one requiring the state to show lack of prejudice, makes no sense." *Id.*

The error in this case is subject to the same analysis as that in *Noushfar, Guam,* and *Riley.* As in those cases, the impact of the *ex parte* communication "on the jury's performance of its duties cannot be reviewed." Even though the abdication present in *Riley* is not present here, analysis under the structural error rubric is appropriate because the effect of the *ex parte* communication is unknowable.

The holding in *Noushfar* was limited to some extent by *Eslaminia v. White,* 136 F.3d 1234 (9th Cir.1998). The Court of Appeals held that a jury's consideration of a taped interview that had not been admitted into evidence between the police and defendant's brother was a trial error. The Court declined to label the error structural, noting that

> [s]tructural error are relatively rare, and consist of serious violations that taint the entire trial process, thereby rendering appellate review of the magnitude of the harm suffered by the defendant virtually impossible.... By contrast, jury consideration of taped comments by a non-testifying party raises discrete evidentiary issues that the court may clearly identify and ana-

lyze, and is similar to other commonly-recognized trial errors.

*Id.* at 1237, n. 1 (habeas relief granted).

As discussed above, the nature of the *ex parte* communication in this case renders impossible any review of its impact, and thus the magnitude of the harm suffered by petitioner as a result. Unlike concrete evidence, albeit extrinsic, where the Court can evaluate the counterbalancing effect of the properly admitted evidence in determining the effect of the error, an *ex parte* communication does not constitute evidence subject to counterbalancing by other evidence presented during trial. That the question posed was "hypothetical" provides even stronger support for this conclusion. The judge's answer, even if theoretically correct, given in response to a question seemingly unrelated to the facts of the case, leaves even more room for wayward thoughts by the jury evoked unwittingly by any errant words of the judge.

Recently, in *Mach v. Stewart,* 137 F.3d 630 (9th Cir.1997), the Ninth Circuit declined to find structural error when the jury panel was exposed to a potential juror's "expert-like statements" regarding sexual abuse of children. *Id.* at 632–33. During voir dire, a potential juror informed the judge and the panel that she had substantial expertise in the area of sexual abuse of children as a social worker, stated that she had never been involved in a case of alleged sexual abuse against a child where the child's statements had not been borne out, and that she had never known a child to lie about sexual abuse. *Id.* The appellate court explained that given the potential juror's experience and conviction, "we presume that at least one juror was tainted and entered into jury deliberations with the conviction that children never lie about being sexually abused. This bias violated Mach's right to an impartial jury" guaranteed by the Sixth Amendment, requiring reversal. *Id.* at 633. The Court held that the error,

> the jury's exposure during voir dire to an intrinsically prejudicial statement

made four times by a children's social worker, occurred before the trial had begun, resulted in the swearing in of a tainted jury, and severely infected the process. *Id.* The Court explained that it would not be the correct approach to "quantitatively assess [the error] in the context of other evidence presented [citation omitted], because all of the 'other evidence' presented during the case was received by a jury that was biased." *Id.*

The Court declined to label the error "structural," however, because it also found that the "error requires reversal under the harmless-error standard as well...." *Id.* at 634. Because the "result of the trial in this case was principally dependent on whether the jury chose to believe the child or the defendant ... [t]here can be no doubt that [the potential juror's] statements had to have a tremendous impact on the jury's verdict." *Id.*

The same result obtains in this case under both analyses. Because the forensic evidence was largely inconclusive, the result in petitioner's trial turned on a credibility determination. The parties had already presented the jury with all of the evidence, but the jurors suspected that there was more to know. It is plausible that the jury would have found information of petitioner's past acts dispositive, even though a verdict based on a theory that "he's done it before, he did it again" would be erroneous. Although the judge reported the substance of the *ex parte* communication to the parties on the record shortly thereafter, it remains unknown exactly what transpired between the judge and the jury and what direction or inferences the jury drew from his response. Indeed, only one thing is certain; the judge did not make clear to the jury that what they were asking about had no place in their deliberations.

Under the circumstances, as in *Mach*, it is not unreasonable to presume that at least one juror was tainted and resumed jury deliberations with the conviction that petitioner committed bad acts in the past but that those acts were kept from the jury to prevent bias. Such bias and suspicion, which surfaced yet again in a written question, violated petitioner's right to an impartial jury. *Id.* Under the trial error analysis as well, the judge's response "had to have a tremendous impact on the jury's verdict." *Id.; see* discussion re trial error, *infra.*

In many respects, this case presents an error more deleterious to the proper execution of justice—unreported judge-jury communications concerning both evidence and law applicable to the case being deliberated—than that presented in *Mach*, and thus, the structural error analysis is the more appropriate. Here, by the time the error occurred, the jury had heard all of the evidence but had not reached or could not reach a decision. The jury then actively sought out information that might tip the scales. The jury's question itself hints at the jurors' perception that information was kept from them because of legal shenanigans, so it is not implausible to question whether the jury deliberately inquired of the judge first, by way of a hypothetical question, in order to avoid what the jurors suspected would be a sanitized answer from the judge and lawyers if asked in open court.

Under the unusual circumstances of this case, the Court holds that the *ex parte* communication between judge and deliberating jurors, outside the presence of counsel and accused, without record, constitutes structural error.

### G. Trial Error

Even if the Court were to determine that the constitutional error in this case is not structural, but trial error, the error would not be viewed as harmless.

### 1. Substantial and Injurious Effect or Influence in Determining the Jury's Verdict

Under the standard established by *Brecht*, a "federal court may grant habeas relief based on trial error only when that

error had substantial and injurious effect or influence in determining the jury's verdict." *Calderon,* 119 S.Ct. at 503 (citations omitted). "[T]he court must find that the defendant was actually prejudiced by the error." *Id.* (citing *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710.) "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence." *O'Neal,* 513 U.S. at 438, 115 S.Ct. 992. "[E]ven a single juror's improperly influenced vote deprives the defendant of an unprejudiced, unanimous verdict." *Lawson,* 60 F.3d at 613.

■ The Court of Appeals for the Ninth Circuit "has observed that 'reversible error commonly occurs where there is a direct and rational connection between the extrinsic material and a prejudicial jury conclusion, and where the misconduct relates directly to a material aspect of the case.'" *Lawson,* 60 F.3d at 612–13 (citing *Marino v. Vasquez,* 812 F.2d 499, 506 (9th Cir.1987)). In *Lawson,* a juror introduced extrinsic evidence during deliberations of defendant's reputation for violence. The defendant was on trial for first degree murder, committed while engaged in an attempted robbery. The prosecutor had rested its theory of the case on the felony-murder rule, and the jury was instructed that it had to find a specific intent to rob. *Id.* at 609. The Ninth Circuit, in reviewing the habeas corpus petition, found that the extrajudicial information "was both directly related to a material issue in the case and highly inflammatory." *Id.* at 613 (citing *Dickson v. Sullivan,* 849 F.2d 403 (9th Cir.1988), finding prejudice where a deputy escorting the jury told the jurors out of court that the defendant had "done something like this before").

In this case, it cannot be concluded that the *ex parte* communication was harmless. As in *Lawson,* the judge's conversation with the deliberating jurors regarded a prejudicial hypothetical situation involving the criminal history and character of the defendant. At Delgado's trial, the court

discussed the *ex parte* communication's effect on the trial in response to petitioner's motion for a mistrial. The trial judge said that the error was harmless, finding that "[t]he answer given in response to the written question was substantially the same as the answer that they secured out of me as they came in that morning." (RT 1670–73).

The California Supreme Court stated that "the trial judge should have declined to answer the juror's question, immediately terminated all discussion, and reminded the jury that any questions of law on which they desired guidance must be in writing," 5 Cal.4th at 331, 19 Cal.Rptr.2d 529, 851 P.2d 811, but it essentially agreed with the foregoing evaluation by the trial judge.

The accuracy of this conclusion must be doubted. The jury's *written* question,

> If available, would the prosecution have been allowed to present evidence and/or testimony indicating that Mr. Delgado had a tendency toward violence (for example, similar to that presented concerning Manual [sic] Ortiz)

was followed by the response,

> You must decide all questions of fact in this case from the evidence received in this trial and not from any other source. You are not to speculate as to the existence or nonexistence of any fact not suggested by the evidence.

Contrast this response with the trial judge's *oral* statement in the back corridor,

> "the law basically said that [any prior crime] was inadmissible as it would cause a jury to conclude a defendant who had done it before had done it again . . . "

when responding to a query to the effect,

> what of a person charged with rape who had previously been convicted of rape.

The latter response condoned (or at least did not convey disapproval of) the jury's speculating on the existence of evidence of prior violence on defendant's part *and* proceeded to inform the jury that due to the

law's strictures, they would not be told of such evidence if it did exist. The former response, submitted in writing after the trial judge conferred with all counsel, .attempted to get the jury back on track by implicitly disapproving of their query about other evidence and telling them to stick to the evidence of record.

These responses are not the same. The California Supreme Court regarded the juror's back-hall inquiry as pertaining to "questions of law." *Id.* In fact, both of the jurors' inquiries pertained to the law applicable to the evidence in their case—perhaps absent or unavailable evidence, perhaps unintentionally omitted evidence, or perhaps suppressed and excluded evidence—but the very extent of the basis for their decision was at the heart of the jurors' questions.

This Court, sitting in judgment on the habeas corpus petition, must view the *ex parte* communication separate and apart from the subsequent written instruction and answer. As noted above, in *Mach v. Stewart,* 137 F.3d 630 (9th Cir.1997), the Court explained that it would not be the correct approach to "quantitatively assess [the error] in the context of other evidence presented, because all of the 'other evidence' presented during the case was received by a jury that was biased." *Id.* (citation omitted). Here, the jury, demonstrably wayward in its speculative deliberations, was informed that "other acts" evidence, even if it did exist, would not be forthcoming, rather than being told to decide the case based on the evidence received at trial.

There is no question as to the accuracy of the statement of law in the response to the *written* question. But, the *ex parte* communication, as the trial judge specifically noted, was troubling, in that *"[o]bviously, it was something that they had been worrying about, kicking around back there."* *Id.* (emphasis added). It is irrelevant whether, in the abstract, what the trial judge said in the back-hall conversation was an "accurate statement of the law." To a misguided question, a misguid-

ed and irrelevant, albeit correct, statement of law does not avoid error or prejudice. As the jury struggled with its questions about the possibility of defendant's undisclosed prior misconduct, the communication was obviously material to their quandary. For these reasons, the trial court's *ex parte* statements cannot be deemed harmless, even in light of the subsequent question and answer. Examined in this light, the state court's conclusion to the contrary lacks support in the record.

## 2. Grave Doubt

When a federal habeas court finds a federal constitutional "trial" error, it is the responsibility of that court "to determine whether the error affected the judgment." *O'Neal,* 513 U.S. at 437, 115 S.Ct. 992. The "reviewing court making this harmless-error inquiry does not ... 'become in effect a second jury to determine whether defendant is guilty.'" *Neder,* —— U.S. at ——, 119 S.Ct. at 1839 (citation omitted). However, when "the record is so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of an error .... the petitioner must win." *Id.;* see also *Thompson v. Borg,* 74 F.3d 1571, 1575 (9th Cir.1996); *Atwood,* 1999 WL 390852 (N.D.Cal.1999).

Both the California Court of Appeal and Supreme Court decisions voice concern over not only the harmlessness of the error, but also the strength of the evidence supporting defendant's conviction. The Court of Appeal found that "this was not a strong case, particularly in light of Ruiz' confession of guilt at the motion for new trial." Further, in dissent, Justice Mosk of the California Supreme Court noted that "the prosecution's case was less than overwhelming." *Delgado,* 5 Cal.4th at 334, 19 Cal.Rptr.2d 529, 851 P.2d 811. Justice Mosk briefly summarized the conflicting evidence from trial and noted the trial judge's observation that the "evidently exhausted jurors" found the three and one-half days of deliberations "stressful." 5 Cal.4th at 334, 19 Cal.Rptr.2d 529, 851

P.2d 811. Justice Mosk concluded: "All of these factors give rise to substantial doubt about defendant's role in Amanda's death." *Id.*

Although this case presents an issue over which reasonable judges could differ, and have differed, this Court, at the very least, finds itself in a "state of equipoise which would invoke the 'grave doubt' rule." *Thompson v. Borg,* 74 F.3d 1571, 1575 (9th Cir.1996); *see also O'Neal,* 513 U.S. at 435, 115 S.Ct. 992. The Court cannot inquire into the minds of each individual juror to discover if the *ex parte* communication had a substantial and injurious effect on the jury's verdict. In light of the trial court's own suggestion that the jury had struggled with the question asked and answered *ex parte,* and the inability to know what effect the subsequent question and answer had on the jury, this Court cannot conclude that the error is harmless. The petitioner must prevail. *See Atwood,* 1999 WL 390852 at *5.

### VII.

### *CONCLUSION*

Accordingly and for the foregoing reasons, the Court grants a conditional Writ of Habeas Corpus. This conditional writ shall become unconditional and permanent unless the State of California initiates proceedings for a new trial against Petitioner Steven Delgado within 120 days of this Order in Orange County Superior Court Case No. C–76591.

IT IS SO ORDERED.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Order on all counsel of record.